1    Manufacturer Defendant to provide an MSRP and each Retailer Defendant to limit, or even refrain from,

2    discounting below MSRP; accordingly, such conduct cannot be the basis for an inference of conspiracy.

3    This is the antithesis of a situation where an inference of conspiracy is warranted under a "plus factor"

4    analysis.[19]  Finally, this case does not involve fungible products which by their interchangeable nature

5    facilitate horizontal conspiracy; to the contrary, the products here are differentiated products (*e.g.*, face

6    creams and lipstick) that cannot be substituted for each other.

7            In sum, plaintiffs could not sustain their burden of proving a horizontal conspiracy to fix the

8    retail prices of prestige cosmetics through direct or circumstantial evidence under traditional antitrust

9    analysis, leaving them with only two possible arguments to circumvent their failure of proof: that (1) the

10   existence of certain vertical marketing arrangements between some manufacturers and retailers creates

11   an inference of illegal conspiracy; and (2) the prevalence of such practices in a supposedly concentrated

12   industry is sufficient to prove conspiracy.  Both of these arguments fail.

13           **B.    Plaintiffs Have No Evidence of a Vertical Conspiracy**

14           Plaintiffs have no evidence of a vertical conspiracy and cannot prove their case under either a

15   *per se* or rule of reason analysis.

16           **1.    Plaintiffs cannot prove a *per se* illegal vertical agreement to fix retail
                    prices**

17

18           There is no proof that any Manufacturer Defendant conspired to fix the resale prices of its

19   prestige cosmetics.  The fact that a manufacturer suggests a resale price for its products based on its

20   independent assessment of marketplace conditions is no proof whatsoever of a conspiracy to fix resale

21   prices.  Indeed, it is well-established that a "manufacturer can announce its resale prices in advance and

22   refuse to deal with those who fail to comply . . . ."  Monsanto, 465 U.S. at 761 (citing United States v.

23   Colgate & Co., 250 U.S. 300, 307 (1919)) (noting that, furthermore, "a distributor is free to acquiesce

---

24   [19]   Even if plaintiffs could show that some defendants follow pricing or other practices of their
              competitors (which they cannot), that does not establish an unlawful conspiracy.  See, e.g.,
25            Wilcox, 815 F.2d at 526.  Indeed, the legality of price leadership has been settled for over 75
              years.  See United States v. Int'l Harvester Co., 274 U.S. 693, 708-09 (1927); see also
26            Reserve Supply Corp. v. Owens-Corning Fiberglass Corp., 971 F.2d 37, 50 (7th Cir. 1992)
              (noting that "individual pricing decisions (even when each firm rests its own decision upon
27            its belief that competitors will do the same) do *not* constitute an unlawful agreement under
              section 1 of the Sherman Act . . . .  How does one order a firm to set its prices *without regard*
28            to the likely reactions of its competitors?") (italics in original) (citation omitted).

1   in the manufacturer's demand in order to avoid termination"). Here, all plaintiffs can point to is the fact

2   that many of the Manufacturer Defendants suggest resale prices, and that many of the Retailer

3   Defendants follow those suggestions. This is perfectly lawful. See, e.g., Monsanto, 465 U.S. at 761;

4   Acquaire v. Can. Dry Bottling Co., 24 F.3d 401, 410 (2d Cir. 1994) (noting that "[e]vidence of pricing

5   suggestions, persuasion, conversations, arguments, exposition, or pressure is not sufficient to establish

6   the coercion necessary to transgress § 1 of the Sherman Act").

7        The practices about which plaintiffs complain in the instant case fall far short of what

8   Colgate would permit. For example, under the "Colgate doctrine," it is not illegal for a manufacturer

9   unilaterally to announce that noncompliance with certain policies may result in termination. See, e.g.,

10  Russell Stover Candies, Inc. v. F.T.C., 718 F.2d 256, 260 (8th Cir. 1983). Nor does the mere fact that

11  a retailer acquiesces in a manufacturer's suggested resale price suffice to establish an illegal resale price

12  maintenance agreement absent evidence that the retailer was not free to exercise its own pricing

13  discretion. See, e.g., Gray v. Shell Oil Co., 469 F.2d 742, 747-48 (9th Cir. 1972). There is no proof

14  whatsoever that any of the Retailer Defendants have ever "involuntarily" adhered to a manufacturer's

15  MSRP or involuntarily agreed to refrain from discounting.[20] The record evidence is to the contrary; the

16  Retailer Defendants' pricing decisions are based on their independent business judgment.

17       Faced with the patent insufficiency of their proof of any illegal agreement to fix the resale prices

18  of prestige cosmetics, plaintiffs contend that the Manufacturer Defendants have "coerced" the Retailer

19  Defendants into non-discounting behavior through various policies concerning promotions, cooperative

20  advertising, returns, etc. This argument is flawed as a matter of fact and law. The supposedly coercive

21  practices of the Manufacturer Defendants are *entirely lawful* under the antitrust laws; indeed, no case

22  authority supports the proposition that a manufacturer's use of lawful marketing practices can constitute

23  coercion, and thereby create a *per se* illegal vertical price fixing arrangement that, in the absence of such

24  lawful practices, would not be deemed to exist. Moreover, the facts demonstrate the lack of coercion.

25       Nor can plaintiffs rely on meetings among individual prestige cosmetics manufacturers, on the

26  one hand, and each of their respective distributors (*i.e.*, the Retailer Defendants), on the other, as

27

28  [20]   Of course, if possible, a retailer would prefer not to discount the products it sells since mark-downs decrease profits. Thus, retailers are happy to accept the offer of many Manufacturer Defendants and return unsold product rather than marking it down.

KAYE SCHOLER llp

evidence of a conspiracy. Given the fact that such meetings are obviously necessary and incidental to the marketing of prestige cosmetics,[21] they are not probative of wrongful conduct. That is,

> [T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market . . . . Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities so that their product will reach the consumer persuasively and efficiently.

Monsanto, 465 U.S. at 762-64.[22]

### 2. The non-price vertical arrangements challenged by plaintiffs are entirely lawful under the rule of reason

In contrast to vertical minimum price-fixing agreements, agreements between a manufacturer and a retailer as to non-price matters are evaluated under the rule of reason, "which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition." Monsanto, 465 U.S. at 761. In general, a rule of reason analysis involves a finding of market power and then the balancing of an arrangement's pro-competitive effects and its anti-competitive effects, and will only result in a finding of illegality if the anti-competitive effects outweigh the pro-competitive benefits. See, e.g., Sylvania,, 433 U.S. at 49-50.

Under the teachings of Sylvania, non-price vertical arrangements are almost invariably deemed lawful under the rule of reason because antitrust law recognizes that such arrangements may "promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." 433 U.S. at 54.[23] Furthermore, "antitrust law permits nonprice vertical restraints that

---

[21] See, e.g., Yerman (Conopco) Ex. 14 ## 25, 27 ("A number of [Retailer Defendants] are customers of Conopco, so Conopco personnel frequently communicates with [them] . . . . Conopco, however, is not aware of any such communications in furtherance of or related to any understanding or agreement that would violate any antitrust or other law").)

[22] In addition, the cases are legion that meetings of competitors at trade associations are legally insufficient to prove a conspiracy. See, e.g., Citric Acid, 191 F.3d at 1099-1100 (holding that defendant had legitimate business reasons for its membership in a trade association, its gathering of information about competitors' prices, and its strategic decisions to expand production).

[23] Interbrand price competition, of course, is the "primary concern of the antitrust laws." Bus.

(continued...)

KAYE SCHOLER llp

KAYE SCHOLER<sub>LLP</sub>

1   are designed to facilitate the provision [by a retailer] of extra services . . . ." Toys "R" Us, Inc. v. F.T.C.,

2   221 F.3d 928, 938 (7th Cir. 2000). In addition, courts have correctly recognized that a retailer "may have

3   a better understanding than his supplier of which intrabrand restraints will most significantly enhance

4   the interbrand competitiveness of the supplier's goods at the retail level" and often the market strategy

5   of intrabrand restraints "will be the product of consultations between the supplier and his distributors."

6   Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 593-94 (8th Cir. 1987).[24]

7          Viewed within this legal context, it is apparent that the challenged marketing practices of the

8   Manufacturer Defendants are completely lawful. In many instances, the challenged practice involves

9   a policy that the manufacturer has independently announced which the retailer is free to follow or not.

10  Under Monsanto, such circumstances do not constitute an agreement subject to scrutiny under the

11  antitrust laws. Nonetheless, for the sake of brevity and solely for the purposes of this discussion, we

12  assume *arguendo* that the practices described below constitute "agreements" between individual

13  manufacturers and retailers, and therefore should be evaluated under the rule of reason. Even with that

14  unsupportable assumption, however, each of the challenged practices is entirely lawful.

15         Limited Distribution and Anti-Diversion Policies.  Manufacturer policies aimed at limiting

16  diversion of their products to distribution channels other than department stores -- such as limitations

17  on the amount of products a single customer may purchase or selling only to certain types of retailers --

18  are pro-competitive and lawful. See, e.g., O.S.C. Corp. v. Apple Computer, Inc., 601 F. Supp. 1274,

19  1294-95 (C.D. Cal. 1985), aff'd, 792 F.2d 1464 (9th Cir. 1986) (holding that the prohibition on mail

20  order sales by distributors found lawful because, *inter alia*, it ensured adequate customer support and

21  prevented "free-riding" off distributors who provided comprehensive customer support); Clairol, Inc.

22  v. Boston Disc. Ctr. of Berkley, Inc., 608 F.2d 1114, 1121 (6th Cir. 1979) (holding that Clairol's

23

24  [23]   (...continued)
        Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 727 (1988).

25  [24]   Vertical non-price cases are rarely filed and almost never won. This is true even if a
26        manufacturer has market power but is especially true in the absence of market power because
          it is well-settled that non-price vertical restraints are presumptively lawful in the absence of
27        market power. With so many competitors and so many diverse products, it is highly unlikely
          that any of the players in the prestige cosmetics industry could be found to have market
28        power -- another reason that plaintiffs' challenges to defendants' practices are doomed.

prohibition against resale of professional-use hair coloring to non-salon outlets was lawful because, *inter alia*, such sales would tend to "injure [Clairol's] reputation and good will"); <u>Pants "N" Stuff Shed House, Inc. v. Levi Strauss & Co.</u>, 619 F. Supp. 945, 948 (W.D.N.Y. 1985) (holding that Levi's policy of selling only to retail outlets and limiting or terminating sales to any retailers who diverted merchandise -- designed to improve brand image through selection of distribution channels, as well as to improve retailer feedback and increase retailer good will -- was lawful); <u>Michael Halebian N.J., Inc. v. Roppe Rubber Corp.</u>, 718 F. Supp. 348, 358 (D. N.J. 1989) (citing cases for the proposition that a manufacturer's "independently imposed policy against transshipping [by distributors] is not unreasonable"). Here, the anti-diversion and selective distribution policies are beneficial for all defendants and are based on legitimate business interests.

Cooperative Advertising. "Cooperative advertising" policies pursuant to which an individual manufacturer will not contribute to a retailer's advertising the manufacturer's product at prices below MSRP are lawful. Such policies are judged favorably under the rule of reason so long as retailers are free independently to advertise (or sell) the manufacturer's product at prices below MSRP. <u>See, e.g.,</u> <u>In re Nissan Antitrust Litig.</u>, 577 F.2d 910, 917 (5th Cir. 1978) (holding that a cooperative advertising program that required dealers to list either the manufacturer's suggested retail price or no price at all in an advertisement partly financed by the manufacturer was not a per se violation of the Sherman Act); <u>In re Adver. Checking Bureau, Inc.</u>, 109 F.T.C. 146, 147 (1987) (noting that cooperative advertising programs are "likely to be procompetitive" and "may stimulate dealer promotion and investment and, thus, benefit interbrand competition"). Individual cooperative advertising policies of the Manufacturer Defendants promote interbrand competition by affording retailers greater opportunities (through lower advertising costs) to advertise a greater variety of brands.

Cooperative Product Support. Another form of competition in the prestige cosmetics business is the provision of cooperative funding for presentation at the point of sale (*i.e.*, branded sales counters and in-store displays), as well as the training and compensation of salespersons dedicated to a particular manufacturer's products. All of this contributes to the visibility and brand equity of the manufacturer's product and to competition between manufacturers (interbrand competition). Such practices are universally sustained under the rule of reason. <u>See</u> <u>Slowiak v. Hudson Foods, Inc.</u>, No. 91-C-737-S,

1992 WL 176983, at \*\*9-10 (W.D. Wis. Apr. 8, 1992) (holding that defendant who financed sales contests, employee uniforms, in-store demonstrators, and promotional materials, did not coerce plaintiff into setting maximum resale prices).

Return Policies. Many Manufacturer Defendants have flexible return policies that permit retailers to return merchandise, for credit, that they are having difficulty selling. Plaintiffs' apparent theory is that if the goods could not be returned, they would be discounted. But this theory ignores the overwhelming pro-competitive virtue of such return policies, i.e., they strongly facilitate a retailer's willingness to carry a broad range of each manufacturer's products, allowing manufacturers to compete through the introduction of many differentiated products. Absent these return policies, a retailer would understandably be reluctant to carry a wide range of stock-keeping units ("SKUs") because, even with the ability to discount, the retailer might be left with unsold product. Once again, therefore, the challenged practice promotes rather than inhibits interbrand competition, because it provides an incentive to retailers to offer full lines of a brand's products and offers consumers a wider variety of products from which to choose. As such, it easily withstands scrutiny under the rule of reason.

Promotions and Promotional Calendars. Prestige cosmetics are often sold by some defendants on promotion. These promotions are pro-competitive because they enhance interbrand competition. Moreover, the effect of many promotions is actually to provide a "discount" off of the regular resale prices of cosmetics products.

Not satisfied with such an indisputable benefit, plaintiffs complain that some Manufacturer Defendants ask retailers not to run simultaneous promotions of their brands and a competing brand, and that some Retailer Defendants ask manufacturers not to simultaneously promote their products at competing department stores. This complaint ignores the substantial financial investment that manufacturers and retailers have in such consumer-friendly promotions, their understandable desire to get the "biggest bang for their buck" when running those promotions and the clear fact that alternative policies would harm interbrand competition. Such partial exclusives are presumptively lawful. See Acquaire, 24 F.3d at 410 (noting that "manufacturers should be allowed to implement reasonable procedures to ensure that" the benefit of a program is received by its intended beneficiary.) If retailers were unwilling to give exclusivity on the Manufacturer Defendants' promotions, the promotions would

inevitably be reduced or eliminated. If manufacturers were unwilling to avoid holding simultaneous promotions in a Retailer Defendant's store and "across the street," the promotions would be less successful and less vigorously marketed by the retailers, which in turn would lead to fewer promotions and reduced interbrand competition. Moreover, as a factual matter, the practices of the Retailer Defendants confound plaintiffs' claims regarding the alleged uniformity of these practices: Retailer Defendants often have overlapping, interbrand promotions. In short, assuming *arguendo* that promotional calendars reflect agreements between individual manufacturers and individual retailers, those agreements are clearly lawful under the rule of reason because, *inter alia*, they serve to ensure the continuing success of GWP and PWP promotions which are integral to vigorous inter-brand competition among the manufacturers of prestige cosmetics.

### C. Plaintiffs' Unfair Competition Act (Section 17200) Claim Is Similarly Without Merit

Plaintiffs' claim that defendants' conduct is "unfair" under California's Unfair Competition Act, Cal. Bus. & Prof. Code §17200, *et seq.*, similarly would not have succeeded. Under the Unfair Competition Act, "unfair conduct"

> means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co., 83 Cal. Rptr. 2d 548, 565 (Cal. 1999).

Here, the allegations underlying plaintiffs' Section 17200 claim are the same as those underlying their antitrust claim. Accordingly, because defendants' conduct does not violate the antitrust laws, is not unfair and, in fact, enhances competition, the Cel-Tech standard is not met; thus, defendants' conduct cannot be found to violate Section 17200. See, e.g., Carter v. Variflex, Inc., 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000) (where summary judgment was proper on Sherman Act and Cartwright Act claims, summary judgment also was proper on Section 17200 "unfair competition" claim in light of Cel-Tech); Townshend v. Rockwell Int'l Corp., No. C99-0400, 2000 WL 433505, at **14-15 (N.D. Cal. Mar. 28, 2000) (where motion to dismiss granted on Sherman Act claims, dismissal of Section 17200 claim was also required based upon Cel-Tech); see also Chavez v. Whirlpool Corp., 113 Cal. Rptr. 2d 175, 184 (Cal. Ct. App. 2001) (upholding dismissal of a Section 17200 claim on grounds that such conduct was permissible under the Cartwright Act and thus could not be deemed "unfair").

### III. NONE OF THE OBJECTIONS RAISE GROUNDS TO DENY FINAL APPROVAL OF THE SETTLEMENT

#### A. The Settlement Is Fair, Reasonable and Adequate and Therefore Should Be Approved

There is a "strong judicial policy in favor of settlements in complex class actions." S.F. NAACP v. S.F. Unified Sch. Dist., Nos. C-78-1445, C-94-2418, 2001 WL 1922333, *5 (N.D. Cal. Oct. 24, 2001). Prior to approving a settlement, the district court must "determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." Hanlon v. Chrysler Corp., 150 F.3d 1011,1026 (9th Cir. 1998). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Id. A district court should approve the settlement unless the settlement, "is so unfair on its face as to preclude judicial approval." Republic Nat'l Life Ins. Co. v. Beasley, 73 F.R.D. 658, 667 (S.D.N.Y. 1977) (citation omitted) (internal quotations omitted).

Often, courts will balance the following factors in assessing a settlement proposal:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon, 150 F.3d at 1026. Applying those factors to the instant case clearly demonstrates that the settlement should be approved. The reasonableness and adequacy of the instant settlement is apparent from the very generous relief being provided to the settlement class despite the extreme weaknesses of plaintiffs' case. See, e.g., Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 576 (9th Cir. 2004) (upholding the district court's finding that the settlement was fair and adequate where the district court found, *inter alia*, "that the plaintiffs were unlikely to succeed on the merits"); In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458-59 (9th Cir. 2000); Walsh v. Great Atl. & Pac. Tea Co., 96 F.R.D. 632, 642 (D. N.J.), aff'd, 726 F.2d 956 (3d Cir. 1983). In addition, any further litigation would be complex and costly. Although plaintiffs had already reviewed over a million documents, defendants had responded to extensive written discovery and both sides had taken many depositions, the case would likely have continued for years. Thus, settlement was definitely the best route in the instant case, and counsel on both sides of this case believe that the settlement is reasonable, fair and adequate. Given the fact that only 26 objections (one of which was untimely), comprised of 73 individual objectors, have been filed

KAYE SCHOLER<sub>llp</sub>

in this case (<u>see</u> White Decl. at ¶9), despite the fact that approximately 38 million class members were reached by the notice (<u>see</u> Kinsella Decl. at ¶13), clearly the proposed settlement class believes so, too.[25]

Fairness is demonstrated in the instant case by the fact that the settlement was non-collusive and resulted from arms-length negotiations involving a highly-respected mediator. <u>See</u>, <u>e.g.</u>, <u>In re Sorbates Direct Purchaser Antitrust Litig.</u>, No. C 98-4886, 2002 WL 31655191, at *4 (N.D. Cal. Nov. 18, 2002) (approving an antitrust settlement where, *inter alia*, "the settlement was the result of arm's length, non-collusive negotiations between counsel for plaintiffs and counsel for the Settling Defendant"); <u>In re Cardizem CD Antitrust Litig.</u>, 218 F.R.D. 508, 530, (E.D. Mich. 2003).

**B.    None of the Objections Raise Grounds Sufficient to Deny Final Approval**

None of the points raised in the objections constitutes a basis for denying settlement approval.

**1.    Procedural objections**

A few objections raise issues that can best be described as procedural. First, several objections suggest that it would make sense to appoint a settlement monitor. The parties do not oppose this suggestion, and intend to file a stipulation to this effect with the Court, proposing an order pursuant to which a settlement monitor will be appointed.

Second, some objections complain about the schedule of the final settlement approval process, claiming, for instance, that the Court should have required plaintiffs to submit their fee application prior to the fairness hearing. But the schedule in the instant case is typical, was set by Kinsella, a highly-respected notice consultant, and was approved and ordered by the Court.

---

[25]    The number of objectors is extremely low: only 0.0002% of the settlement class objected to the settlement. <u>See</u>, <u>e.g.</u>, <u>Churchill Vill.</u>, 361 F.3d at 577 (affirming settlement approval, noting that "only 45 of the approximately 90,000 notified class members [or 0.05%] objected to the settlement); <u>Schwartz v. Dallas Cowboys Football Club, Ltd.</u>, Civ. A. No. 97-5184, 2001 WL 1689714, at *3 (E.D. Pa. Nov. 21, 2001) (approving settlement, noting that "[t]he original notices were sent out to approximately 1.8 million class members. Of those, . . . twenty objected. Thus, less than .1% of the class objected").

## 2. Objections regarding product give-away

### a. Value of the product give-away

#### (1) The amount of the settlement is fair

Some objections complain that defendants should provide more than $175 million in products to the settlement class. As is discussed throughout this brief, given the profound weaknesses of plaintiffs' case, $175 million is fair, reasonable and adequate under the circumstances here.

Courts have consistently found that the value of a settlement may properly reflect the weakness of a plaintiff's case. In fact, the unsoundness of a plaintiff's claims is of critical importance, because a court must "judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981); see also Boyd v. Bechtel Corp., 485 F. Supp. 610, 617-18 (N.D. Cal. 1979) (approving the settlement where "plaintiffs do not have a strong case" after noting that "[f]irst, and most important, a settlement must be evaluated in light of the strength of the case, and the court must balance the probable outcome of an action, if tried, against the provisions of the settlement"); In re Med. X-Ray Film Antitrust Litig., No. CV-93-5904, 1998 WL 661515, at **4-5 (E.D.N.Y. Aug. 7, 1998) (noting that the difficulty of proving conspiracy, as opposed to lawful competitive practices, and the consequent likelihood of a battle of experts evaluating circumstantial evidence, is a factor in approving adequacy of settlement); New York v. Reebok Int'l Ltd., 903 F. Supp. 532, 536 (S.D.N.Y. 1995) (noting that the difficulties of distinguishing between lawful unilateral conduct and unlawful coercion or conspiracy, and need to show effect on prices, supported approval of settlement); In re Agent Orange Prod. Liab. Litig., 597 F. Supp. 740, 762 (E.D.N.Y. 1984) (noting that "[t]he weakness of plaintiff's case, the availability of defenses to the suit, and the risks of establishing liability and damages at trial must be factored into this balance" of determining settlement approval), aff'd, 818 F.2d 145 (2d Cir. 1987).

Given the lack of any evidence of an antitrust violation by any defendant, had the parties decided not to settle, it is likely that the putative plaintiff class would have recovered nothing.

#### (2) Retail value is the proper measure of relief since it is what the settlement is worth to the class

Some objections complain that the value of the settlement has been falsely inflated because the

$175 million is based on retail value of the free products, rather than the cost to defendants of manufacturing those products. Retail value is the appropriate measure of what the settlement is worth to the class -- that is why the relief provided for by the settlement is appropriately expressed in terms of retail value. See, e.g., O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 304 (E.D. Pa. 2003) (noting that "[t]he settlement fund should be based on the benefit to the class and not the cost to the defendant"); Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 71 (D. Mass. 1997) (noting that "the value of a settlement should not be measured by its cost to the defendant, but by its benefit to the class"); In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 557 (D. N.J. 1997) (noting that "[t]he cost of the relief to [defendant] is not the measure of class member benefit. The value of the relief to the Class, which may be substantial, is what matters") (citation omitted); Shaw v. Toshiba Am. Infos. Sys., Inc., 91 F. Supp. 2d 942, 960 (E.D. Tex. 2000) (stating that "[t]he in-kind relief made available . . . provides significant value to class members"); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 304 (N.D. Ga. 1993) (noting the "face value" of the certificates being distributed); In re Cuisinart Food Processor Antitrust Litig., M.D.L. 447, 1983 WL 153, *2 (D. Conn. Oct. 24, 1983) (noting the value of the coupons to be given away in terms of the discount they would provide off of "the suggested *retail* price") (emphasis added).

The Manufacturer Defendants intend to give away products regularly sold at retail -- whether in standard SKUs or specially manufactured packages -- so there can be no questions as to the legitimacy of the retail value assigned to the products. This fact, coupled with the clear direction of the caselaw, demonstrates that retail value is the fair and appropriate measure of the value of the relief to be provided to the class.

### (3) "First come, first served" is the only fair way to distribute the product that defendants have agreed to provide

"First come, first served" is the fairest way to distribute the free products -- only through this method can the parties ensure that the free product winds up in the hands of the settlement class members who go to the stores of the Retailer Defendants to claim them.[26] While it cannot be guaranteed

---

[26] While some objectors complain that a "first come, first served" product give-away is unfair because perhaps not every settlement class member would receive a product, others worry
(continued...)

KAYE SCHOLER llp

1  that everyone wishing a free product will get one, between seven and ten million products will be

2  distributed.[27]

3      Notably, although the settlement class is estimated to be composed of approximately 38 million

4  members (see Kinsella Decl. at ¶13), only roughly 370,000 people registered to receive notice of the

5  give-away (see White Decl. at ¶¶12-13).

6          (4)    It would not be feasible to provide different relief to the
                  class members based on the amount of their past purchases

7

8      The only practical method of allocating the products among the settlement class members is for

9  each individual to receive the same relief regardless of the amount of prestige cosmetics that he or she

10 purchased over the class period.   In light of the small value of the individual claims, it simply is not

11 feasible to spend the time, money and resources to custom-tailor relief for each class member and to

12 determine how many products each member should receive.   To structure the settlement in that way

13 would also increase the burden on class members to substantiate their claimed product purchases.   Under

14 the circumstances of this case, the only practical way to allocate the products is one per person.

15         (5)    Plaintiffs could never have proven their case, thus
                  the total damages that "would have been available"
16                had the case gone to the jury is irrelevant

17     Some objections state that the fairness of the settlement cannot be evaluated because the total

18 amount of damages that would have been available had the case gone to the jury has never been stated.

---

19  [26]   (...continued)
20         that not all of the product would be claimed.  Some in this latter group state that they do not
           believe that unclaimed product should be given to charity, as the distribution plan provides,
21         but rather that the settlement give-away should continue indefinitely.  This idea is
22         unworkable as defendants should not be required to disrupt their regular business indefinitely.

23         Moreover, courts regularly approve of giving away unclaimed settlement relief to non-profit
           organizations.  See, e.g., Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1307
24         (9th Cir. 1990) (noting that "[w]e have found no Ninth Circuit precedent rejecting the use of
25         cy pres or fluid distribution solely as a method of allocating unclaimed damages"); In re
           Wells Fargo Sec. Litig., 991 F. Supp. 1193, 1198 (N.D. Cal. 1998) (distributing remaining
26         residue of antitrust class action settlement to the Stanford Law School Securities Class
           Action Clearinghouse).
27

28  [27]   With $175 million worth of product being distributed, even if each defendant were to give
           away a product worth $25, seven million products would be distributed.

The answer to this question is that *no* damages would have been available in this case, because plaintiffs could not have sustained their case. As courts have stated, at the final fairness hearing, "[d]ollar amounts are judged not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." Agent Orange, 597 F. Supp. at 762; see also Hanlon, 150 F.3d at 1027 (approving the settlement even after noting that "[o]f course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this possibility does not mean that the settlement presented was not fair, reasonable or adequate"); Biancur v. Hickey, No. C 95-2145, 1997 WL 767521, at *2 (N.D. Cal. Nov. 19, 1997) (stating "[t]he Court acknowledges that the settlement is only a small fraction of the approximately $15,000,000 lost by investors in this case. Nevertheless, plaintiffs would likely face serious problems in proving liability on the part of the settling defendants"); Williams v. Vukovich, 720 F.2d 909, 922 (6th Cir. 1983) (noting that "[a] court may not withhold approval simply because the benefits accrued from the [settlement] are not what a successful plaintiff would have received in a fully litigated case . . . . A [settlement] is a compromise which has been reached after the risks, expenses, and delay of further litigation have been assessed"); Boyd, 485 F. Supp. at 618 (noting that it "is not necessary or expected that litigants will obtain through settlement all they might have realized through a victorious trial"; thus, "simply because a settlement may amount to only a fraction of the potential recovery does not in itself render it unfair or inadequate").

### b. Product, rather than cash or coupons, is the appropriate relief in the instant case

First, cash would not be a practical form of relief in the instant case because the amount that each class member would receive is so small it would be *de minimus*. Moreover, if processing costs and the attendant burden are considered, a small cash settlement would clearly be inferior to the proposed product settlement. See, e.g., In re Mex. Money Transfer Litig., 164 F. Supp. 2d 1002, 1031-32 (N.D. Ill. 2000) (finding that direct distribution of $4.6 million in cash to 13.5 million class members was unwarranted), aff'd, 267 F.3d 743 (7th Cir. 2001); Wells Fargo, 991 F. Supp. at 1196 (noting that "obviously, it would be absurd to spend $5.50 in class funds to send a three cent check to Mr. Allen or a thirty-eight cent check to Mr. Campbell").

Second, coupon settlements are typically subjected to heightened scrutiny. See, e.g., Mex. Money, 267 F.3d at 748-49. Coupon-based programs are particularly problematic where, as here, the coupons would necessarily be for a small amount, the exact size of the settlement class is unknown, and redemption rates cannot be accurately forecast. See, e.g., Petruzzi's, Inc. v. Darling-Del. Co., 880 F. Supp. 292, 297-98 (M.D. Pa. 1995).

### c. The give-away product will be current, high-end, desirable product

Many of the objections focus on the precise products that will be given away and whether they will be desirable products. What these objectors fail to recognize is that because image is everything in the prestige cosmetics industry, the Manufacturer Defendants have every incentive to offer product consistent with their brand image.

Specifically, as of now,[28] the Manufacturer Defendants intend to give-away the following:

- Boucheron -- Boucheron intends to give away a package of two products: a ½ ounce bottle of perfume plus a second item (probably a lotion). Each of the products will be of the Boucheron brand, and the package will have a $25 retail value.

- Chanel -- Chanel intends to provide class members with a choice of either a scented body lotion "mini" (most likely from the Coco Mademoiselle fragrance line) or a lipstick (each qualified class member would be entitled to receive one of the two). Each of the products will be of the Chanel brand. The lotion will have a $25 retail value, and the lipstick will have a $23-$25 retail value, depending on the particular lipstick offered.

- Dior Perfumes -- Dior Perfumes intends to provide class members with a perfume "mini" which will be of a current Dior Perfumes brand (e.g., J'Adore). The product will have a $25 retail value.

- Clarins -- Clarins intends to provide class members with a choice of two facial moisturizers (each qualified class member would be entitled to receive one of the two). Each of the products will be of the Clarins brand and will have a $25 retail value.

- Conopco -- Conopco intends to provide class members with a choice of several "packages" of products (each qualified class member would be entitled to receive one of the packages). The packages will consist of two products, and there will be a few different combinations, such as a lipstick and an eye shadow or a foundation and a blush. Each of the packages will be of the Calvin Klein Color brand and will have a $25 retail value.

---

[28] Because distribution of the products likely will not occur for some time, it is conceivable that some of the Manufacturer Defendants will give away products different from those described above. Whichever products they distribute, they will be of a quality and value equivalent to those described here.

- Estée Lauder -- Estée Lauder intends to provide class members with a choice of two products (each qualified class member would be entitled to receive one of the two). The products will be from two of the Estée Lauder brands -- Estée Lauder and Clinique. In all likelihood, both the Clinique and Estée Lauder products will be skin treatments. Each product will have a $25 retail value.

- Parfums Givenchy -- Parfums Givenchy intends to provide class members with a perfume "mini." The product will be of the Parfums Givenchy brand and will have a $25 retail value.

- Guerlain -- Guerlain intends to provide class members with a perfume "mini." The product will be of the Guerlain brand and will have a $25 retail value.

- L'Oréal -- L'Oréal intends to provide class members with a choice of several product packages (each qualified class member would be entitled to receive one of the options). One of the product packages will be of the Lancôme brand and will likely consist of two unisex skin care products. The other product packages will be branded fragrances from L'Oréal's Designer Fragrance Division and will consist of a fragrance and shower gel. There will likely be three or four different brands represented in the Designer Fragrance Division packages, and at least one of the packages will be of men's products. Each package will have a $25 retail value.

### d.   The settlement product give-away will include products for men

A few objections complain that no men's product will be available. As is described immediately above, in addition to products traditionally used by women (like makeup), the products to be given away will include either "unisex" products (such as face creams) or products specifically designed for men (such as cologne).

### e.   The product give-away is not merely a promotion

Several objections challenge the give-away as being the same type of promotion that defendants have held in the past. This is untrue: there is a clear and absolute difference between GWP and PWP promotions and the settlement product give-away: with the promotions, consumers are required to make a purchase before receiving a product. With respect to the settlement product give-away, on the other hand, the consumers will be entitled to the product for free.

A few objections complain that defendants will replace regularly scheduled promotions with the settlement product give-away, thereby depriving class members of those promotions. This is false: the settlement give-away is independent and will not take the place of an already-scheduled promotion.

### 3. Objections regarding the distribution plan

Many objections focused on the specifics of the product distribution plan. The various issues raised are dealt with below.

#### a. Timing of the give-away

The give-away should take place at a time that will provide the best opportunity for settlement class members to obtain their free product; this means that the give-away should not take place during a holiday period as stores during those times are over-crowded and, consequently, salespeople would not have time to deal with the give-away in addition to their normal duties. Moreover, most of the Manufacturer Defendants will need to manufacture the products in excess of their existing inventory which has a lead time of approximately eight months; time for manufacturing and distribution needs to be considered before specifying the time of any product give-away.

#### b. Location of the give-away

Several objections raise issues regarding where the products will be available -- both in terms of where on a national level as well as where in the Retailer Defendants' doors.

First, the products will be given away at the Retailer Defendants' stores on a nationwide basis. The Retailer Defendants intend to give away each brand's product from each of their doors that sells that brand -- typically based on the percentage of the particular brand's sales to each door of each Retailer Defendant.[29] A list of individual doors and what brands' products they will be distributing during the settlement product give-away will be provided on the settlement website, which will be listed in the email and postcard notifications as well as in the notice that will be published a few weeks before the give-away (the "back-end notice").

Within each door, the Retailer Defendants plan to give away the product from the sales counter dedicated to that brand or the "fragrance bar" (i.e., the counter from which many different fragrance brands are sold). For example, Estée Lauder products will be given away from the Estée Lauder counter, and Lancôme products will be given away from the Lancôme counter.

---

[29]  For logistical reasons, it may make sense for a few of the smaller manufacturers to concentrate their products in less than all doors, but every step will be taken to ensure that their products nonetheless are widely available to all customers who seek them.

KAYE SCHOLER llp

### c.    Certification

A few objections challenge the certification that defendants intend to have settlement class members sign in order to obtain their free product. In fact, however, one of the objections pointed out the very balance that defendants have achieved -- a certification that will neither be overly intrusive nor so weak that it will be ineffective. (See Yerman Ex. 4.)

Defendants believe it is appropriate to ask that class members sign a simple certification so as to deter non-class members from taking product to which they are not entitled as well as to prevent "double-dipping" by class members. Courts have uniformly approved of such a requirement. See, e.g., In re Motorsports Merch. Antitrust Litig., 112 F. Supp. 2d 1329, 1331 (N.D. Ga. 2000) (approving a price-fixing settlement involving merchandise sold at NASCAR races where plaintiffs were required to prove a qualifying purchase or attendance at a qualifying race, or submit a sworn claim).

Defendants will not use the information obtained in the certifications for any marketing or other purpose. When the give-away is completed, the Retailer Defendants will deliver the certifications directly to the Settlement Administrator with instructions to destroy them.

### 4.    Objections regarding notice

None of the objections that focus on the settlement notices provides a basis for finding that the settlement is in any way unfair or insufficient.

As is described in the attached declaration of Katherine Kinsella, a highly-respected notice consultant, the notice plan was carefully designed to reach an extremely large percentage of the settlement class, and, in fact, reached 91.3% of the class members, with each class member exposed to the notice 4.4 times. These figures compare favorably with other class action cases in which notice has been deemed effective. In In re Compact Disc Minimum Advertised Price Antitrust Litig., a notice program also designed by Katherine Kinsella to reach millions of unidentified CD purchasers was estimated to have reached "at least 85% of the music-consuming public in the country with an estimated frequency of more than four times." 216 F.R.D. 197, 203 (D. Me. 2003). The court concluded that the program was "excellently designed, reasonably calculated to reach potential class members, and ultimately highly successful in doing so." Id. at 204; see also In re Am. Family Enters., 256 B.R. 377, 417 (D. N.J. 2000) (finding notice "adequate and sufficient" where the plan, also designed by Kinsella,

1   reached "at least 90 to 93% of Class Members an average of 2.8 to 3.1 times"). The notice in the instant

2   case clearly should be deemed effective.[30]

3       A few objections suggest that the Retailer Defendants should have provided notice to their credit

4   card customers in their credit card statements, but this is impractical and unnecessary for several reasons.

5   First, over 90% of the settlement class received the notice, so there is no need for any additional notice.

6   Second, notice by means of credit card statements would be both over-inclusive and under-inclusive:

7   many members of the settlement class do not possess credit cards issued by the Retailer Defendants (thus

8   a credit card holder notification plan would discriminate against them), and many Retailer Defendant

9   cardholders are not purchasers of department store cosmetics. In addition, given the fact that the

10  settlement class includes residents "of the United States who purchased Department Store Cosmetics

11  in the United States, which products were made, distributed and/or sold by the Defendants during the

12  period May 29, 1994 through July 16, 2003," providing notice to *current* store credit card holders would

13  fail to target potential class members and would waste resources that are better directed to more efficient

14  means of reaching class members.

15      The complaint that the Retailer Defendants should have provided notice at the cosmetics counters

16  is similarly without merit. Because the published notice reached over 90% of the settlement class, the

17  notice obviously was effective. Moreover, providing such a notice before the settlement was approved

18  and the products were made available would potentially have been highly misleading to the customers.

19      Finally, one objection states that the back-end notice, described above, should be published in

20  the same periodicals as the initial notice. Since the original notice reached over 90% of the settlement

21  class and those individuals were provided the opportunity to register to receive, at no cost, a postcard

22

23

24  [30] Courts have similarly lauded Rust Consulting, the Settlement Administrator in this case. See,
25      e.g., Elkins v. Equitable Life Ins. Co. of Iowa, No. 96-296-CIV-T-17B, 1998 WL 133741, at
        *23 (M.D. Fla. Jan. 27, 1998) (finding that a notice program administered by Rust Consulting
26      provided the class with "extensive and comprehensive notice" that "exceeded the
        requirements of applicable law, the rules of this Court, and due process under the federal
27      constitution"); In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369, 382 (D. D.C.
        2002) (finding that the "extensive efforts" of notice consultants Kinsella and Rust Consulting
28      in identifying and notifying class members yielded "impressive" results and constituted "the
        best notice practicable under the circumstances" (thus meeting the standard under Rule 23)).

KAYE SCHOLER llp

1  or email notice of the precise dates of the give-away, it would be unduly burdensome to require the back-

2  end notice to be published anywhere other than the periodicals in the top-25 DMAs.

3  **5.  Objections regarding the Stipulated Order**

4  A few objections discuss the Stipulated Order that will govern defendants' conduct once it is

5  entered by the Court. At the outset, it should be noted that defendants' current practices do not violate

6  the antitrust laws. Thus, there is no need for the Stipulated Order to prevent defendants from continuing

7  with these practices -- whether in distribution, pricing, marketing or otherwise.

8  Nevertheless, the Stipulated Order does "have teeth." First, all defendants are expressly

9  prohibited from engaging in various types of conduct that would violate the antitrust laws. Second, as

10  is discussed in more detail above, the Manufacturer Defendants are required to send a letter to all of their

11  retailers (and to all new retailers for three years) that states, among other things, that the Manufacturer

12  Defendants will not agree with any retailer on price and that in non-cooperative advertising any price

13  suggested by the Manufacturer Defendant is merely a suggestion. Third, the Manufacturer Defendants

14  are prohibited from "[s]uggesting or recommending an MSRP or Resale Price to any Department Store

15  Defendant in writing on any price list or order form unless it clearly states the following caveat on each

16  page of such list or form: 'The Retail Prices Quoted Herein Are Suggested Only. You Are Completely

17  Free to Determine Your Own Retail Prices.'" (Yerman Ex. 1 at Ex. B.) And fourth, the entire Stipulated

18  Order has to be distributed to certain employees at the Retailer and Manufacturer Defendants.[31]

19  **6.  Objections regarding the scope of the release**

20  Any assertion that final approval should be withheld because the settlement's release (see

21  Yerman Ex. 1 ¶¶18-19) is overbroad is contrary to the law and ignores defendants' entitlement to peace

22  in exchange for the consideration they are providing under the settlement. It is well-established that a

23  class action settlement can include an agreement to release defendants from any related claim, including

24

---

25  [31]  Notably, just as they do when evaluating the amount of tangible relief to be provided to a
class, courts also take into account the strength of the plaintiffs' case in evaluating conduct
26  relief provisions of settlements. See, e.g., Officers for Justice v. Civil Serv. Comm'n, 688
F.2d 615, 623, 629 (9th Cir. 1982) (affirming approval of the consent decree -- despite
27  complaint that the injunctive relief would only serve to "perpetuate the discriminatory
practices for an unreasonable length of time" -- after considering the strength of appellants'
28  case and their chances of being successful if the case were to be fully tried on the merits).

claims that could have been (but were not) asserted in the settled action. See, e.g., Howard v. Am. Online Inc., 208 F.3d 741, 747 (9th Cir. 2000) (approving a settlement agreement that barred all claims that "arise out of or are related to the matters referred to" in the complaint); Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1287 (9th Cir. 1992) (noting that a court may release "a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*") (emphasis in original) (citation omitted); Sorbates, 2002 WL 31655191, at *1 (approving a settlement that released defendants from all current and future claims "arising out of or resulting from direct purchases of Sorbates and conduct concerning the pricing, selling, discounting, marketing, or distributing of Sorbates to the Class at any time prior to the date of the respective Settlement Agreements"); Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 18 n.7 (2d Cir. 1981) (stating that "a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same of facts"); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 482 (S.D.N.Y. 1998) (noting that "[a]s summarized in the leading treatise on class actions, a 'release of claims may refer to all claims raised in a pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action'") (citation omitted).

The release in the instant case does not violate due process since class members were adequately represented and received adequate notice of the claims and adequate compensation for those claims. See, e.g., Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1994) (noting that "[c]lass members who are not parties to a class action suit nevertheless are bound by the judgment in the suit, and due process is satisfied, if the members' interests are adequately represented by the class members who are present").

In this settlement, the release bars only those claims arising from facts alleged in the complaint and ensures that defendants will not be forced to re-litigate the core questions which are addressed by the action being settled.[32] Such a release is clearly supported by the caselaw.

_____

[32] The release specifically states that "Nothing in the Settlement Agreement or in this Order is intended to release any other claim(s) that a Plaintiff or member of the Settlement Class may have against one or more of the Settling Defendants. For example, a personal injury or a

(continued...)

## 7.    **Objections regarding attorneys' fees**

Defendants have *not* agreed with plaintiffs on the amount of attorneys' fees plaintiffs will receive.  To the contrary, the amount of attorneys' fees has been left exclusively to the Court.  (See Yerman Ex. 1 ¶6.)  Defendants simply agreed that they would not oppose a fee award up to a certain amount -- an agreement a few objectors found suspect.  Their concerns are misplaced.

Agreements not to oppose fees up to a specified amount, sometimes called "clear sailing" provisions, are common in class action settlements.  See, e.g., Lobatz v. U.S. W. Cellular of Cal., Inc., 222 F. 3d 1142, 1149 (9th Cir. 2000) (awarding fees in amount plaintiffs requested where that amount was the limit to which defendants agreed not to object); In re Prudential Ins. Co. of Am. Sales Practices, 148 F.3d 283, 335 (3d Cir. 1998) (affirming settlement agreement containing clear-sailing provision).

While courts do consider the nature of fee arrangements when analyzing the reasonableness of class action settlements, including those containing clear sailing provisions, courts also recognize that payments that do not diminish plaintiffs' award and "arm's length negotiation of the attorneys' fees after the substantive terms of the settlement had been resolved convincingly negate any suspicions that might arise about [clear sailing provisions]."  Duhaime v. John Hancock Mut. Life Ins. Co., 989 F. Supp. 375, 379 (D. Mass. 1997); see also Malchman v. Davis, 761 F.2d 893, 905 n.5 (2d Cir. 1985), abrogated on other grounds, Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) (stating that "where, as here, the amount of the fee is important to the party paying them, as well as the attorney recipient . . . an agreement not to oppose an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged"); Skelton v. Gen. Motors Corp., 860 F.2d 250, 259-60 (7th Cir. 1988) (holding that clear sailing provision was not objectionable after arms' length negotiations).

As set forth above, plaintiffs and defendants participated in extensive arms' length negotiations.  Further, the settlement's substantive terms were resolved before the parties began negotiating fee arrangements.  See Duhaime, 989 F. Supp. at 379.  Thus, the existence of a clear sailing provision, given the circumstances in this case, in no way diminishes the reasonableness of the settlement agreement.

---

[32]    (...continued)
product defect claim is not released."  (Yerman Ex. 1 ¶¶18-19.)

1    **IV.**    <u>**CONCLUSION**</u>

2      For the foregoing reasons, defendants respectfully request that the Court grant plaintiffs' motion

3 for final approval of class settlement and plan of distribution.

4

5 DATED: May 14, 2004                Respectfully submitted,

6                                    KAYE SCHOLER LLP

7                                    ROSEN, BIEN & ASARO, LLP

8                                    Attorneys for Defendant
                                   THE ESTÉE LAUDER COMPANIES INC.

9

10                                    Fredric W. Yerman

11                                    AND ON BEHALF OF ALL COUNSEL FOR
                                   DEFENDANTS LISTED BELOW

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| **Defendants' Counsel** | | |
|---|---|---|
| Penelope A. Preovolos, Esq.<br>Terri Garland, Esq.<br>Kristin J. Moody, Esq.<br>Morrison & Foerster, LLP<br>425 Market St.<br>San Francisco, CA 94105<br>Telephone: (415) 268-7000<br>Fax: (415) 268-7522<br>Attorneys for Defendant<br>CHANEL, INC. | Joel S. Sanders, Esq.<br>G. Charles Nierlich, Esq.<br>Gibson, Dunn & Crutcher,<br>LLP<br>One Montgomery St.<br>Telesis Tower, 26th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 393-8200<br>Fax: (415) 986-5309<br>Attorneys for Defendants<br>UNILEVER UNITED<br>STATES, INC.; CONOPCO,<br>INC. | Peter J. Venaglia, Esq.<br>Teresa Boyle, Esq.<br>Dornbush Mensch Mandelstam<br>& Schaeffer, LLP<br>747 Third Ave.<br>New York, NY 10017<br>Telephone: (212) 759-3300<br>Fax: (212) 753-7673<br>Attorneys for Defendant<br>BOUCHERON (USA) LTD. |
| Bruce H. Jackson, Esq.<br>Christopher Van Gundy, Esq.<br>Baker & McKenzie<br>Two Embarcadero Center,<br>Suite 2400<br>San Francisco, CA 94111<br>Telephone: (415) 576-3000<br>Fax: (415) 576-3099<br>Attorneys for Defendant<br>BOUCHERON (USA) LTD. | Donn P. Pickett, Esq.<br>Holly A. House, Esq.<br>Marta Miyar, Esq.<br>Bingham Mccutchen LLP<br>Three Embarcadero Center<br>San Francisco, CA 94111<br>Telephone: (415) 393-2000<br>Fax: (415) 393-2286<br>Attorneys for Defendants<br>LVMH MOET HENNESSY<br>LOUIS VUITTON, INC.,<br>CHRISTIAN DIOR<br>PERFUMES, INC.,<br>GUERLAIN, INC., AND<br>PARFUMS GIVENCHY,<br>INC., COMESTICS OF<br>FRANCE, INC.,<br>GUERLAIN, INC., and<br>GIVENCHY<br>CORPORATION | Robert Oppenheim, Esq.<br>Coblence & Warner<br>415 Madison Ave.<br>New York, NY 10017<br>Telephone: (212) 593-8382<br>Fax: (212) 593-9058<br>Attorneys for Defendant<br>CLARINS U.S.A., INC. |
| James T. Fousekis, Esq.<br>Piper Rudnick LLP<br>333 Market St., Suite 3200<br>San Francisco, CA 94105<br>Telephone: (415) 777-3999<br>Fax: (415) 442-0839<br>Attorneys for Defendant<br>CLARINS U.S.A., INC. | | Amy Anne Stathos, Esq.<br>Jeffrey A. LeVee. Esq.<br>Jones, Day, Reavis & Pogue<br>555 West Fifth St., Suite 4600<br>Los Angeles, CA 90013<br>Telephone: (213) 489-3939<br>Fax: (213) 243-2539<br>Attorneys for Defendant<br>FEDERATED DEPARTMENT<br>STORES |
| Phillip A. Proger, Esq.<br>Jones, Day, Reavis & Pogue<br>51 Louisiana Ave., N.W.<br>Washington, D.C. 20001-2113<br>Telephone: (202) 879-3939<br>Fax: (202) 626-1700<br>Attorneys for Defendants<br>MACY'S CALIFORNIA,<br>INC., FEDERATED<br>DEPARTMENT STORES,<br>BLOOMINGDALES, INC.,<br>AND BULLOCKS, INC. | James L. McGinnis, Esq.<br>Sheppard, Mullin, Richter &<br>Hampton, LLP<br>Four Embarcadero Center,<br>17th Floor<br>San Francisco, CA<br>94111-4106<br>Telephone: (415) 434-9100<br>Fax: (415) 434-3947<br>Attorneys for Defendants<br>THE MAY DEPARTMENT<br>STORES COMPANY | Ronald J. Dolan, Esq.<br>Betty T. Tierney, Esq.<br>The May Department Stores<br>Company<br>611 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 342-6512<br>Fax: (314) 342-3066<br>Attorneys for Defendant<br>THE MAY DEPARTMENT<br>STORES COMPANY |

| | | |
|---|---|---|
| Garry L. Halling, Esq.<br>Thomas D. Nevins, Esq.<br>Sheppard, Mullin, Richter &<br>Hampton, LLP<br>Four Embarcadero Center,<br>17th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 434-9100<br>Fax: (415) 434-3947<br>Attorneys for Defendant<br>NORDSTROM, INC. | Larry S. Gangnes, Esq.<br>Nancy W. Anderson, Esq.<br>Lane, Powell, Spears,<br>Lubersky, LLP<br>1420 Fifth Ave., Suite 4100<br>Seattle, WA 98101<br>Telephone: (206) 223-7000<br>Fax: (206) 223-7107<br>Attorneys for Defendant<br>NORDSTROM, INC. | Robert A. Weikert, Esq.<br>Marlene J. Williams, Esq.<br>Thelen Reid & Priest, LLP<br>101 Second St., Suite 1800<br>San Francisco, CA 94105<br>Telephone: (415) 371-1200<br>Fax: (415) 371-1211<br>Attorneys for Defendant<br>GOTTSCHALKS, INC. |
| J. Thomas Rosch, Esq.<br>Karen E. Silverman, Esq.<br>Ellen K. Brown, Esq.<br>Latham & Watkins<br>505 Montgomery St., Suite<br>1900<br>San Francisco, CA 94111<br>Telephone: (415) 391-0600<br>Fax: (415) 395-8095<br>Attorney for Defendant<br>NEIMAN-MARCUS GROUP | Peter H. Goldsmith, Esq.<br>Ariela Freed, Esq.<br>Legal Strategies Group<br>5905 Christie Ave.<br>Emeryville, CA 94608<br>Telephone: (510) 450-9600<br>Fax: (510) 450-9601<br>Attorneys for Defendant<br>SAKS & CO., INC. | Wendy S. White, Esq.<br>Elizabeth R. Geise, Esq.<br>Matthew W. Hoffman, Esq.<br>Shea & Gardner<br>1800 Massachusetts Ave.,<br>N.W., 6th Floor<br>Washington, D.C. 20036<br>Telephone: (202) 828-2000<br>Fax: (202) 828-2195<br>Attorneys for Defendant SAKS<br>& CO., INC. |
| E. Perry Johnson<br>Bryan Cave LLP<br>One Metropolitan Square<br>211 North Broadway, #3600<br>St. Louis, MO 63102<br>Telephone: (314) 259-2000<br>Fax: (314) 259-2020<br>Attorneys for Defendant<br>DILLARD'S, INC. | Anita F. Stork, Esq.<br>Cooley Godward LLP<br>One Maritime Plaza, 20th<br>Floor<br>San Francisco, CA 94111<br>Telephone: (415) 693-2000<br>Fax: (415) 951-3699<br>Attorneys for Defendant<br>DILLARD'S, INC. | Elizabeth A. Bousquette, Esq.<br>Robert J. Dwyer, Esq.<br>Bryan Cave LLP<br>245 Park Ave.<br>New York, NY 10167-0034<br>Telephone: (212) 692-1800<br>Fax: (212) 692-1900<br>Attorneys for Defendant<br>DILLARD'S, INC. |
| Aton Arbisser, Esq.<br>Kaye Scholer LLP<br>1999 Avenue of the Stars,<br>Suite 1600<br>Los Angeles, CA 90076<br>Telephone: (310) 788-1000<br>Fax: (310) 788-1200<br>Attorneys for Defendant THE<br>ESTEE LAUDER COS. INC. | Fredric Yerman, Esq.<br>David Copeland, Esq.<br>Karin Garvey, Esq.<br>Kaye Scholer LLP<br>425 Park Avenue<br>New York, NY 10022-3589<br>Telephone: (212) 836-8000<br>Fax: (212) 836-8689<br>Attorneys for Defendant THE<br>ESTEE LAUDER COS. INC. | Samuel R. Miller, Esq.<br>M. Kay Martin, Esq.<br>Folger Levin & Kahn LLP<br>Embarcadero Center West<br>275 Battery St., 23rd Floor<br>San Francisco, CA 94111<br>Telephone: (415) 986-2800<br>Fax: (415) 986-2827<br>Attorneys for Defendant<br>TARGET CORPORATION |
| Bruce Colbath, Esq.<br>Sharon Selby, Esq.<br>Weil, Gotshal & Manges, LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Telephone: (212) 310-8000<br>Fax: (212) 310-8007<br>Attorneys for Defendant<br>L'OREAL USA, INC.(f/k/a/<br>COSMAIR, INC.) | Jeffrey G. Knowles, Esq.<br>A. Marisa Chun, Esq.<br>Coblentz, Patch, Duffy &<br>Bass, LLP<br>1 Ferry Building, Suite 200<br>San Francisco, CA 94111<br>Telephone: (415) 391-4800<br>Fax: (415) 989-1663<br>Attorneys for Defendant<br>L'OREAL USA, INC.(f/k/a/<br>COSMAIR, INC.) | Gregory Philip Farnham, Esq.<br>Townsend & Townsend &<br>Crew<br>Two Embarcadero Center, 8th<br>Floor<br>San Francisco, CA 94111-3834<br>Telephone: (415) 273-4161<br>Fax: (415) 576-0300<br>Attorneys for Defendant SAKS<br>& CO., INC. |

KAYE SCHOLER llp

# PROOF OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the City and County of San Francisco, California, and not a party to the within action. My business address is 155 Montgomery Street, 8th floor, San Francisco, California 94104. On the date specified below, I served a true copy of the following document:

**Defendants' Memorandum Of Law In Support Of Plaintiffs' Motion For Final Approval Of Class Settlement And Plan Of Distribution**

**Declaration Of Fredric W. Yerman In Support Of Defendants' Memorandum Of Law In Support Of Plaintiffs' Motion For Final Approval Of Class Settlement And Plan Of Distribution**

**Declaration Of Katherine Kinsella In Support Of Defendants' Memorandum Of Law In Support Of Plaintiffs' Motion For Final Approval Of Class Settlement And Plan Of Distribution**

**Declaration Of James G. White In Support Of Defendants' Memorandum Of Law In Support Of Plaintiffs' Motion For Final Approval Of Class Settlement And Plan Of Distribution**

**Defendants' Memorandum Of Law In Opposition To Objectors Casenza And Matherne's Application To Intervene**

By depositing copies of the described documents in the United States mail in San Francisco, California, in a sealed envelope, with postage fully prepaid, addressed as follows:

Charles V. Berwanger, Esq.
Gordon & Rees
101 West Broadway, Suite 1600
San Diego, California 92101

John H. Boone, Esq.
Law Offices of John H. Boone
555 California St., Suite 3160
San Francisco, CA 94104

Bruce Colbath, Esq.
Sharon Selby, Esq.
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153

Craig C. Corbitt, Esq.
Zelle, Hofmann, Voelbel
& Gette, LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104

Ronald J. Dolan, Esq.
Betty T. Tierney, Esq.
The May Department Stores Company
611 Olive Street, Suite 1750
St. Louis, Missouri 63101

Michael L. Flannery, Esq.
The David Danis Law Finn, LLC
8235 Forsyth Blvd., Suite 1100
St. Louis, MO 63105

Larry S. Gangnes, Esq.
Nancy W. Anderson, Esq.
Lane, Powell, Spears, Lubersky, LLP
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101

Wendy S. White, Esq.
Elizabeth R. Geise, Esq.
Matthew W. Hoffman
Shea & Gardner
1800 Massachusetts Avenue, N.W.
8th Floor
Washington, D. C. 20036

Steven Helfand
Helfand Law Offices
225 Bush Street, 16th Floor
San Francisco, CA 94104

J. Garrett Kendrick, Esq.
Kendrick & Nutley
468 N. Camden Drive, Suite 200
Beverly Hills, California 90210

John H. McKinley, Esq.
Brown Hall Shore & McKinley, LLP
3031 West March Lane, Suite 230 West
Stockton, CA 95219-6500

W. Timothy Needham, Esq.
Janssen, Malloy, Needham, et al.
730 Fifth Street
P.O. Drawer 1288
Eureka, California 95502

Gretchen M. Nelson, Esq.
Law Offices of Gretchen M. Nelson
707 Wilshire Blvd., Suite 5000
Los Angeles, California 90017

Charles M. Thompson, Esq.
Charles M. Thompson, P.C.
2142 Highland Avenue South
Birmingham, AL 35205

Steven B. Witman, Esq.
Law Offices of Steven B. Witman
3850 North Causeway Blvd., Suite 1960
Metairie, LA 70002

Mrs. C.A. Butler
4311 23rd Pkwy Apt. 1012
Temple Hills, MD 20748

Leilani Butz
3103 Preston Hall Drive
San Antonio, TX 78247

Norma Young
2874 WeiderMeyer
Arcadia, CA 91006

Kertrena Dawson
2170 NW 97th St.
Apt. A
Miami, FL 33147

James M. Sharp
P.,O. Box 900
Bunker Hill, IN 46914

Nikki H. Gibson
6322 Desco Drive
Dallas, TX 75225

Nina Renaud
604 W. Morgan St., #204
Durham, NC 27701

Tamara Mixon
1614 East 69th St., Apt. 2W
Chicago, IL 60649

Hilton Tomlinson
Pritchard, McCall & Jones, LLC
Attorneys for Sharon Harris
800 Financial Center
505 North 20th St.
Birmingham, AL 35203-2605

J. Scott Kessinger, Attorney
Attorney for Jane Curtman-Schroeder
7304 Michigan Avenue
Saint Louis, MO 63111

R. Stephen Griffis
Attorney for Lisa M. Rice
R. Stephen Griffis, P.C.
2142 Highland Avenue South
Birmingham, AL 35205

Paul D. Wexler
Bragar Wexler Eagel & Morgenstern, LLP
Attorney for Sheila Horn
885 Third Avenue
New York, NY 10022

Kearney Dee Hutsler
Attorney for Wendy Bullock
Kearney Dee Hutsler, P.C.
2142 Highland Avenue South
Birmingham, AL 35205

1   L. Richard LeClair, III                     Jennifer J. Kirk
    LeClair & LeClair, PC                       Deputy Attorney General
2   Attorney for Kamela Wilkinson               Office of the Attorney General
    135 Beaver Street, 2nd Floor                Strawberry Square, 14th Floor
3   Waltham, MA  02452                          Harrisburg, PA  17120

4   Daniel Popeo/Paul D. Kamenar                Zenno Styles
    Attorneys for Tracy Lynn Anderson, et al.   1832 S Arlington Ave
5   Washington Legal Foundation                 Los Angeles, CA  90017
    2009 Massachusetts Ave., NW
6   Washington, DC  20036

7   Audrey Manka                                Jessica Anne Thayer
    15803 W Oaks                                580 Roosevelt Way
8   Minnetonka, MN  55345                       San Francisco, CA 94114

9

10       I declare under penalty of perjury that the foregoing is true and correct.  Executed on

11  this 14th day of May, 2004.

12

13                                          _____
                                            Janet Rexelle
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28